UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN STEMMELIN,

    Plaintiff,

v.

MATTERPORT, INC., et al.,

    Defendants.

No. C 20-04168 WHA

**ORDER RE MOTION FOR CLASS CERTIFICATION**

## INTRODUCTION

In this false and deceptive advertising action, plaintiff seeks to certify a national class and an Illinois class of those who enrolled in defendants' 3D camera partner program. For the following reasons, the motion is **DENIED**.

## STATEMENT

Defendants, Matterport, Inc., and its officers (together, "Matterport"), market "3D cameras that create 3D models of real-world places, which have many potential applications, including in connection with real estate sales." Supporting these cameras, Matterport also offers services such as software for three-dimensional image manipulation and cloud storage. Relevant here, Matterport also developed a Matterport Service Partner (MSP) program as a way for individuals that purchased a camera to start their own business selling 3D scans taken

using the camera. The MSP program provided perks and Matterport pitched the program as a "lucrative, self-owned business."

Plaintiff John Stemmelin of Illinois saw Matterport's ads for the MSP program around January 2017 and purchased his first camera in February. In May, he applied for the MSP program. After many hours learning to use the cameras and attempting to start his own 3D scanning business, Stemmelin had spent more than $22,000 but had little to show for it.

Allegedly, behind Matterport's façade lurked several problems. Stemmelin lists several misrepresentations and omissions Matterport purportedly used to deceive consumers: (1) the Matterport 3D camera is easy to use, and it is easy to learn and perform 3D scanning; (2) Matterport will provide the training materials MSPs need to learn to operate the 3D camera and perform 3D scans; (3) the MSP program is a lucrative business opportunity and MSPs will recoup their initial investment within a matter of months; (4) Matterport will provide MSPs with pre-qualified local leads from businesses and individuals who are serious about purchasing 3D scanning services; and (5) Matterport will provide the tools and resources to ensure the success of the MSP's business. Plaintiff also asserts that Matterport made two noteworthy omissions: (1) that Matterport would compete against MSPs by selling 3D cameras to the MSPs' customers, such that the customers would no longer need the MSPs to do the scanning for them; and (2) despite publicly announcing the withdrawal of a pilot program where Matterport would offer scans directly to consumers, Matterport surreptitiously continued to operate the program as part of a business model designed to compete against MSPs (Br. 6–11).

Stemmelin brought this lawsuit in June 2020, alleging violations, among other claims, unfair and false advertising laws as well as numerous states' business opportunity laws on behalf of a putative class of the deceived. A November 2020 order granted defendants' motion to dismiss (Dkt. No. 38). A February 2021 order granted in part Stemmelin's motion for leave to amend his complaint. The remaining claims allege violations of: (1) California Civil Code Section 17200 and Section 17500; (2) the Illinois Consumer Fraud Deceptive Business Practices Act (ICFA); (3) the Illinois Business Opportunity Sales Law (BOSL); (4) the

California Seller-Assisted Marketing Plan Act (SAMP Act); and (5) breach of the implied covenant of good faith and fair dealing. Only the BOSL claim is asserted against the named directors (Dkt. No. 53).

Here, Stemmelin seeks to have two classes certified:

1. **Illinois Class**: All persons in Illinois who purchased Matterport's Pro, Pro2, or Pro2 Lite 3D Cameras and Matterport's "Cloud Service Plan," and became a Matterport Service Partner ("MSP") since December 2, 2016.

2. **National Class**: All persons in the United States who purchased Matterport's Pro, Pro2, or Pro2 Lite 3D Cameras and Matterport's "Cloud Service Plan," and became a Matterport Service Partner ("MSP") within the applicable limitations period.

Stemmelin asserts claims pursuant to ICFA and BOSL on behalf of the Illinois class, and asserts the remaining, non-Illinois state-law claims on behalf of the national class. This order follows full briefing and oral argument (held telephonically due to the COVID-19 pandemic).

**ANALYSIS**

Class certification under Rule 23(b)(3) is a two-step process. A plaintiff must first show that the four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. For a damages class under Rule 23(b)(3), a plaintiff must also establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A plaintiff bears the burden of demonstrating that these requirements are met. *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013).

The Supreme Court has "cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 465–66 (9th Cir. 2013)

3

(quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  However, "[m]erits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Ibid.*

At the outset, this order summarizes the core problem with class certification.  Stemmelin alleges Matterport induced consumers to buy its 3D cameras through false representations and omissions regarding the MSP program.  However, enrolling as an MSP is merely a free, optional program that camera purchasers can sign up for *after they have already purchased their camera* (and after satisfying several other prerequisites besides).  Yet the classes Stemmelin seeks to certify necessarily include all MSPs, even those that bought their camera for reasons independent of their later decision to become an MSP.  So Stemmelin may have relied upon Matterport's deception regarding the MSP program to make his decision to purchase a camera.  But other consumers purchased their cameras for reasons completely unrelated to the MSP program, such as to help them facilitate their current construction or real-estate business.  And only later did these consumers decide to join the MSP program.  Yet those type of consumers are inherently included in, and cannot be extricated from, the putative classes.  The fact of the matter is, the MSP program's relationship with the (antecedent) purchase of the camera is attenuated, yet the purchase of the camera is the premise for harm here.  This results in proposed classes that lack uniformity and cohesion.  As explained below, this ultimately defeats class certification.

1. **ARTICLE III STANDING.**

This order starts with a preliminary issue regarding Article III standing.  The doctrine of standing effectuates Article III's limitation of federal-court jurisdiction to actual "Cases" and "Controversies."  The Supreme Court has established that the "irreducible constitutional minimum" of standing consists of three elements:  (1) injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by judicial relief.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).

4

A previous order herein dismissed Stemmelin's business opportunity claims for lack of standing, with the exceptions of the Illinois and California claims (Dkt. No. 38). Matterport now asserts another standing argument, saying that plaintiff cannot demonstrate standing for each class member (Opp. 4).

Matterport finds this requirement in the Supreme Court's recent decision *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021). *TransUnion* did hold: "Every class member must have Article III standing in order to recovery individual damages." *Id.* at 2208. Matterport, however, neglects to mention the critical analysis on this point just three sentences later: "A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Ibid.* (quoting *Lujan*, 504 U.S. at 561).

Here, we are at the class certification stage, and not addressing the merits in post-trial motions like *Transunion*. Class certification ensures that the named plaintiff is an adequate representative for the absent class. So, at this point, only the named plaintiff must demonstrate standing through evidentiary proof. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Melendres v. Arpaio*, 784 F.3d 1254, 1261–62 (9th Cir. 2015); *Victorino v. FCA US LLC*, 2021 WL 4124245, at *3–5 (S.D. Cal. Sept. 9, 2021) (Judge Gonzalo P. Curiel); *Backhaut v. Apple Inc.*, 2015 WL 4776427, at *5 (N.D. Cal. Aug. 13, 2015) (Judge Lucy H. Koh).

Matterport does not contest that Stemmelin has adequately established Article III standing. Future questions regarding standing await another day. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594–95 (9th Cir. 2012).

**2.    NUMEROSITY.**

With Article III standing out of the way, this order turns to the class certification requirements of Rule 23(a). Under Rule 23(a)(1), a proposed class must be "so numerous that joinder of all members is impracticable." Matterport does not contest numerosity. The proposed Illinois class contains 61 MSPs while the national class has 2,377 MSPs. Joinder would be impracticable. Plaintiff satisfies the numerosity requirement.

5

### 3. TYPICALITY AND ADEQUACY.

Matterport argues that neither typicality nor adequacy is satisfied here because Stemmelin is subject to unique defenses.

Per Rule 23(a)(3), typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Class certification is inappropriate, however, if a putative class representative is subject to "unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Adequacy under Rule 23(a)(4) is satisfied only if "the representative parties will fairly and adequately protect the interests of the class." The two key inquiries for adequacy are: (1) whether there are conflicts within the class; and (2) whether plaintiff and counsel will vigorously fulfill their duties to the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Unique defenses can go to either typicality or adequacy. *See, e.g.*, *Backus v. ConAgra Foods, Inc.*, 2016 WL 7406505, at *5 (N.D. Cal. Dec. 22, 2016).

For both typicality and adequacy, Matterport focuses on Stemmelin's persistent use of Matterport products and services. He bought his first Matterport Pro camera in February 2017, allegedly upon reliance on Matterport's representations and omissions regarding the MSP program. On March 16, 2017, a few days after receiving the camera, he made his first 3D model. Stemmelin applied to the MSP program on May 18, 2017. He was accepted four days later. Later on in May, Stemmelin traded in his camera for a newer version, a Pro2. That Pro2 camera was stolen, so Stemmelin proceeded to purchase a second Pro2 camera in May 2018. Additionally, Stemmelin currently uses his cloud storage account to host 3D models made by others, ot whom he charges a fee (Shields Decl. ¶ 2; Stemmelin Tr. 49, 68, 112–13, 188–89, Kardassakis Decl. Exh. 218).

Consequently, Matterport contends that Stemmelin's purchase of three cameras in fifteen months is "completely inconsistent with his claims that he was mislead in any material way by

Matterport's alleged deceptive conduct" (Opp. 2). Matterport, however, acknowledges that 640 MSPs have purchased more than one camera (Shields Decl. ¶ 3). This indicates Matterport's general defenses of reliance and proximate cause are not unique to Stemmelin but will apply to a great many putative class members. Nor can it be said that there are conflicts within the class or that Stemmelin or his counsel would not vigorously advocate for the class. Ultimately, as will be explained, the issue Matterport highlights is more a problem with commonality and predominance than typicality and adequacy.

### 4. COMMONALITY AND PREDOMINANCE.

This order now considers commonality and predominance. Under Rule 23(a)(2), a class has sufficient commonality if "there are questions of fact and law which are common to the class." The named plaintiff must show that the class members' claims "depend upon a common contention. . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. To show commonality, a plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quotation and citation omitted).

Superseding commonality, predominance under Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This requirement is satisfied when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication. Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered on the merits in favor of the class. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557–58 (9th Cir. 2019).

Thus, "Rule 23(b)(3) therefore does something that Rule 23(a)(2) alone does not: it compares the quality of the common questions to those of the noncommon questions." William B. Rubenstein, Newberg on Class Actions § 3:27 (5th ed. 2021). An "assessment of predominance begins, of course, with the elements of the underlying cause of action." *Walker v. Life Ins. Co. of the Southwest*, 953 F.3d 624, 630 (9th Cir. 2020) (quotation omitted).

### A.   SECTIONS 17200 AND 17500 CLAIMS.

California's unfair competition and false advertising laws, Sections 17200 and 17500, "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950–51 (2002) (cleaned up). "Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Ibid.* (quotation omitted). Deception is evaluated from the vantage of a reasonable consumer. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Private plaintiffs must also have statutory standing, that is, they must have suffered an economic injury "as a result of" actual reliance on the allegedly deceptive or misleading statements. *In re Tobacco II Cases*, 46 Cal. 4th 298, 325–26 (2009). A plaintiff demonstrates reliance by showing the defendant's material misrepresentation or omission was an immediate cause of the plaintiff's injury-producing conduct. Materiality is generally a question of fact. *Id.* at 327. While the named plaintiff must show proof of actual reliance at the class certification stage, *Tobacco II* recognized a classwide presumption of reliance so long as the defendant "engaged in uniform conduct likely to mislead the entire class." *Davis-Miller v. Auto. Club of S. Cal.*, 201 Cal. App. 4th 106, 121 (Cal. Ct. App. 2011). "In the absence of the kind of massive advertising campaign at issue in *Tobacco II*, the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading." *Mazza*, 666 F.3d at 595–96.

The issue here is statutory standing. Stemmelin has indicated that he himself relied upon Matterport's deception regarding the (free) MSP program in his decision to purchase a camera. Thus, we address whether he can establish a classwide presumption of reliance.

This order starts by walking through the MSP enrollment procedure and the process of purchasing a Matterport camera. A consumer must have a camera in hand *before* they can even apply on Matterport's website to become an MSP. In addition to owning a Matterport camera, the MSP program generally required each applicant to: (1) have a current subscription to the Matterport cloud service; (2) have an email address and website; and (3) submit a sample scan using the camera (possibly a later-added requirement) (Plf's Exh. 29; Fellars Tr. 40–45, Plf's Exh. 2). Then, and only then, could a consumer apply to become an MSP.

Putative class members had a number of avenues through which they could purchase a Matterport camera. One could buy a camera on Matterport's website, buy.matterport.com, or could purchase a camera from Matterport over the phone. In addition, Matterport also used third-party vendors like Amazon.com and B&H Photography to peddle its cameras. Consumers could thus purchase Matterport cameras without ever directly interacting with Matterport (Fellars Decl. ¶¶ 22).

This order does not question that Matterport's advertisements of its MSP program drove *some* camera sales — Mr. Stemmelin is the prime example of that fact. However, internal documentation demonstrates Matterport sales representatives would typically mention the MSP program not as a reason to buy a camera but so that customers could contract with an MSP for a sample scan before buying the camera themselves, a "try-before-you-buy approach" (Plf's Exh. 17; *see also* Plf's Exhs. 22, 30, 31). Other documentation supports the basic principle that the alleged benefits of MSP program was only one selling point among many Matterport used to push its cameras. For example, for real-estate brokers, Matterport would emphasize that 3D scans would help them win more listings (*e.g.*, Plf's Exh. 30).

Stemmelin argues that all MSPs needed to view Matterport's alleged deceptions on Matterport's website prior to joining the MSP program. To apply to be an MSP, an applicant had to fill out a signup form on Matterport's website (Itskovitz Tr. 22–24, Plf's Exh. 1; Fellars

Tr. 38–40; Myers Decl. ¶ 2). Potential MSPs would have to navigate from the "Program Overview" page to the "Apply Today" page (or go directly from the Apply Today page) in order to access the enrollment form (Apply Today webpage, Plf's Exh. 29; Program Overview webpage, Plf's Exh. 33). On those pages, putative class members were exposed to advertising that is alleged to be materially misleading (First Amd. Compl. ¶ 47–48). A consumer, however, could not buy a camera on the MSP program pages.[1]

As noted, Matterport did advertise the MSP program beyond its website. It distributed leaflets at trade shows, created circulars, and had sales representatives give presentations about the program to prospective partners (*e.g.*, Plf's Ehxs. 20, 47, 96). However, not even all the MSP program advertisements contained the alleged misrepresentations or induced consumers to join:

> I purchased my first Pro2 camera via Matterport's 800-number and spoke with a sales representatives [sic]. While the sales representative told me about the Matterport's Service Partner ("MSP") program and that they may send me leads, he never made any promises or guarantees about leads. I did not join the MSP program at that time because I was buying the camera to document construction projects and was not interested in the MSP program's benefits. I did, however, buy the camera and cloud subscription

(Petrie Decl. ¶ 5).

Upon review, this order does not find Matterport's advertisement of its MSP program akin to the "'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements." *Mazza*, 666 F.3d at 596 (citation omitted). Matterport's advertisements of its MSP program did not constitute the primary method it used to advertise its cameras, and not all MSP advertisements

---

[1] Plaintiff requests judicial notice of archival versions of Matterport's website obtained via the Internet Archive's Wayback Machine. Other courts in our district have previously taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. This order will do the same. *See* Fed.R.Evid. 201; *Steinberg v. Icelandic Provisions, Inc.*, 2022 WL 220641, at *2 n.1 (N.D. Cal. Jan. 25, 2022) (Judge Edward M. Chen); *Arroyo v. IA Lodging Santa Clara, LLC*, 2021 WL 2826707, at *2 (N.D. Cal. July 7, 2021) (Judge Lucy H. Koh); *Erickson v. Neb. Mach. Co.*, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015) (Judge James Donato). *Doe v. Xytex Corp.*, 2016 WL 3902577, at *1 n.1 (N.D. Cal. July 16, 2016), involved concerns not present here.

10

1    contained the misrepresentations.  Accordingly, we turn to whether Stemmelin has defined the
2    putative classes in a way to exclude those who were not exposed to the relevant MSP
3    advertising.  He has not.
4         *First*, although all MSPs were exposed to the alleged misrepresentations on Matterport's
5    website when they completed their MSP applications, that does not mean they were necessarily
6    exposed to any misstatements before they purchased their *camera*, the foundation for economic
7    injury here.  As explained, camera ownership is a *prerequisite* to applying to become an MSP.
8    That purchase could take place well before the putative class member decided to become an
9    MSP.  The purchase could take place on a third-party vendors website like Amazon that did
10   not contain the alleged deception.  Even those who purchased their camera on Matterport's
11   website did not need to visit the pages containing the alleged deception to make their purchase.
12   According to declarant and putative class member Dustin Gardner:

> I purchased my Pro1 camera via Matterport's website and did not
> speak with any sales representatives.  At the time I purchased the
> camera, I was unaware of Matterport's Service Partner ("MSP")
> program.  I joined the MSP program approximately five weeks
> after my camera purchase. . . .  My decision to purchase a
> Matterport 3D camera and a cloud subscription were unrelated to
> the MSP program or any statements that Matterport may or may
> not have made about it

(Gardner Decl. ¶¶ 5–6, 14).  And here is the declaration of Basm Mohsen:

> I . . . purchased a Matterport 3D camera because I was impressed
> with the technology . . . .  I still use Matterport cameras, pay for a
> Matterport cloud subscription, and am a member of the MSP
> program today.  I purchased my camera via Matterport's website
> and did not speak with any sales representatives.  At the time I
> purchased my first Matterport, I was unaware of Matterport's
> Service Partner ("MSP") program.  I subsequently learned of and
> joined the MSP program

(Mohsen Decl. ¶¶ 3–7).  Putative class members like Mr. Gardner and Mr. Mohsen
demonstrate that putative class members were not necessarily exposed to the alleged
misrepresentations.  Because Stemmelin has failed to reasonably limit the putative classes to
only those consumers who were exposed to the alleged misrepresentations, he has failed to
establish a presumption of reliance.

11

*Second*, on an even more basic level, multiple confounding variables exist that necessitate individualized inquiries into the economic injury purportedly suffered by putative class members who relied on Matterport's misleading statements. Assuming the putative class member was exposed to the MSP advertisements, did they rely on those advertisements to purchase a camera? Or had they already purchased a camera and they relied upon the Matterport's alleged deception only to join the free MSP program? The proposed classes do not delineate. Again, this is fatal to predominance.

Stemmelin contends "the MSP program was touted as a benefit to help Matterport salespeople sell cameras and Cloud Services, thereby directing individuals interested in Matterport's cameras were exposed [sic] to advertising the MSP program" (Reply Br. 6–7). For the reasons explained, this misses the mark. Stemmelin also argues that "permanently unavailable documentation and ESI would likely have been consistent with the discovery that was produced," and that "[e]vidence also shows that Defendants knew they were engaged in misrepresentations and omissions" (Reply Br. 4). This argument is also of no help because it does not change the underlying defects in Stemmelin's reliance theory.

Lastly, plaintiff also claims that Matterport violates the Section 17200 "unlawful" prong. The "unlawful" prong of Section 17200 prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotation marks omitted). By proscribing "any unlawful" business practice, Section 17200 permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is independently actionable. *Ibid.* Plaintiff premises his Section 17200 unlawful prong claim on violations of the SAMP Act. As explained below, individual questions predominate regarding plaintiff's SAMP Act claim. Consequently, this order finds that individual questions also predominate regarding plaintiff's Section 17200 unlawful prong claim.

### B. ICFA CLAIM.

For the same reasons as stated for the Section 17200 and Section 17500 claims, plaintiff has not demonstrated predominance of classwide issues for his Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) claim. 815 ILCS 505/1 *et seq*.

An ICFA claim has five elements: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff that is (5) a result of the deception. *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). One may only seek relief under ICFA for a material misrepresentation or omission. *Mackinac v. Arcadia Nat'l Life Ins. Co.*, 648 N.E.2d 237, 239 (Ill. App. Ct. 1995).

Actual reliance is not required to establish an ICFA claim. Because ICFA has an objective, reasonable-person standard for materiality, reliance on a material omission is presumed. But an ICFA plaintiff must demonstrate that the defendant's deception was the proximate cause of his or her damage. To demonstrate proximate cause, a plaintiff must "receive, directly or indirectly, communication or advertising from the defendant." *De Bouse*, 922 N.E.2d at 313–14, 316; *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 291 (N.D. Cal. 2017). An inquiry into proximate cause does not necessarily require individualized proof to the extent that class certification is never proper. "[W]here a defendant is alleged to have acted wrongfully in the same manner toward the entire class, the trial court may properly find common questions of law or fact that predominate over questions affecting only individual members." *S37 Mgmt., Inc. v. Advance Refrigeration Co.*, 961 N.E.2d 6, 16 (Ill. App. Ct. 2011); *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 514–515 (6th Cir. 2015); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 996–99 (C.D. Cal. 2015) (citing cases).

Here, however, for the reasons previously explained, individual issues regarding proximate cause do predominate over those issues that could be resolved on a classwide basis. Stemmelin's proposed classes include individuals who: (1) purchased a camera without having ever seen the alleged misrepresentations; (2) joined the MSP program because of the misrepresentations but had already purchased a camera, thus leading to no cognizable damage.

13

1  These differences among the putative class members require that key liability issues can only
2  be resolved on an individual basis. Many members of the two putative classes "could not show
3  any damage, let alone damage proximately caused by [Matterport's] alleged deception."
4  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). Certification "is not appropriate
5  for resolving such highly individualized questions of fact." *Langendorf v. Skinnygirl*
6  *Cocktails, LLC*, 306 F.R.D. 574, 584 (N.D. Ill. 2014) (quoting *Lipton v. Chattem*, 289 F.R.D.
7  456, 462 (N.D.Ill. 2013)).

Additionally, while reliance may be presumed under ICFA, that cannot save a putative class when the nature of the reliance itself is in question. *See Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 747–48 (7th Cir. 2008). Stemmelin argues "a presumption exists that . . . the misrepresentations were material to Class Members' decisions to become an MSP" (Reply. Br. 12). But he needs to demonstrate that class member relied on the misrepresentations regarding the MSP program in their decision to purchase cameras, not merely their decision to join the free MSP program.

Plaintiff has not established predominance for his ICFA claim.

### C. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS.

Under California law, "[e]very contract imposes on each party a duty of good faith and fair dealing in each performance and its enforcement." *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (Cal. Ct. App. 2012) (internal quotation marks and citations omitted). The elements of a violation of the implied covenant of good faith and fair dealing are:

> (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.

*Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010). "The covenant . . . exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*. The covenant thus cannot

14

be endowed with an existence independent of its contractual underpinnings." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000) (cleaned up, emphasis in original); *see also Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995).

The flaw in Stemmelin's certification motion discussed previously arises here in the evaluation of class members' alleged harm. Stemmelin explains that the MSP program's terms and conditions "mention that MSPs would be given leads and marketing assistance, and the necessary implication is that Matterport will not directly compete with MSPs for these potential leads, withhold these leads from MSPs, and conceal that conduct from them" (Reply Br. 8). As an initial matter, the MSP terms of service have always contained an express provision disclaiming any representation or warranty as to the number of leads an MSP will be provided (MSP Terms of Service ¶ 7, Fong Decl. Exh. 214; Fong Decl. ¶ 22). Whether this no-warranties provision circumscribes the good faith covenant presents an issue common to the class. *See Carma Developers (Cal.), Inc. v. Marathon Development Cal., Inc.*, 2 Cal. 4th 342, 373 (1992).

Nevertheless, determining whether harm actually resulted from Matterport's unfair interference with the MSP agreement necessitates individualized inquiries. The proposed classes include, for example, real estate brokers who do not offer scan services directly (Fong Decl. ¶ 17). These types of class members could not demonstrate harm. Moreover, leads that Matterport passed on to MSPs were not uniform, but were typically concentrated in specific geographic areas (Dowdle Decl. ¶ 5). This means some class members may not be harmed at all because there were no leads for Matterport to cannibalize in the first place. These individualized inquiries into the good faith and fair dealing covenant predominate over issues capable of classwide resolution.

Moreover, Stemmelin's liability case is untethered from his damages theory. "[A]ny model supporting a plaintiff's damages case *must* be consistent with its liability case." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (citation and internal quotation marks omitted). In *Comcast*, the Supreme Court rejected the concept that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide" and

15

1    required plaintiffs bringing an antitrust suit to tie each theory of liability to a calculation of

2    damages. 569 U.S. at 35, 37.

3          Stemmelin seeks "recission damages" (Br. 23). The purpose of rescission is to restore

4    the parties to their former position as far as possible. *See Gardiner Solder Co. v. Supalloy*

5    *Corp., Inc.*, 232 Cal. App. 3d 1537, 1544 (Cal. Ct. App. 1991) (citation omitted). Under

6    California law: "The two remedies (rescission and damages) are inconsistent, but in seeking

7    rescission[,] damages may be prayed for in the event rescission cannot be had." *DeCampos v.*

8    *St. Compensation Ins. Fund*, 122 Cal. App. 2d 519, 526 (Cal Ct. App. 1954). In other words:

9    "If true recission is no longer possible (perhaps because the plaintiff no longer owns the

10   subject of the sale), the court may order its monetary equivalent." *Ambassador Hotel Co. v.*

11   *Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999).

12         Stemmelin asserts class members "are entitled to a full refund model of damages because

13   they would not have spent the amounts they did absent Defendants' dishonest practices"

14   (Reply Br. 8). The obvious problem here is that Stemmelin contends Matterport has violated

15   the good faith covenant for the MSP terms of service, which is an entirely different agreement

16   than the one a consumer enters into when he or she purchases a Matterport camera. Recission

17   of the MSP terms of service would not entitle the class member to the purchase price of their

18   Matterport camera, which is how Plaintiff's damages expert would compute damages (Duncan

19   Decl. ¶ 11).

20         Stemmelin has failed to satisfy his burden of demonstrating predominance of common

21   questions of law and fact as to his claim for breach of the implied covenant of good faith and

22   fair dealing.

### D.   THE CALIFORNIA SAMP ACT AND THE ILLINOIS BOSL CLAIMS.

25         The California Seller Assisted Marketing Plan (SAMP) Act provides a private right of

26   action for those harmed by a seller assisted marking plan, where a business sells goods or

27   services to a purchaser so that the purchaser can peddle those goods or services themselves.

28   Cal. Civ. Code §§ 1812.200 *et seq*. The SAMP Act places various requirements on those who

sell, lease, or offer to sell or lease a seller assisted marking plan in California, such as: (1) registering disclosure statements with the California Attorney General; (2) prohibiting certain representations and activities; (3) requiring the dissemination of disclosure statements to potential purchasers; and (4) requiring the dissemination of an information sheet at least 48 hours prior to the execution of agreement or receipt of any consideration. *Id.* §§ 1812.203–206. The SAMP Act also enumerates ten exceptions not included within the definition of seller assisted marketing plan. *Id.* § 1812.201(b).

Next, the Illinois Business Opportunity Sales Law of 1995 (BOSL) serves a similar purpose as the California SAMP Act. 815 ILCS 602/5-1 *et seq.* All qualifying business opportunities as defined by the BOSL must be registered with the state. *Id.* § 5-25. With registration comes other mandates, such as disclosure requirements and prohibitions on certain representations and practices. *Id.* §§ 5-30, 5-35, 5-95, 5-105. The BOSL's definition of business opportunity is similar to that of the SAMP Act's definition of a seller assisted marketing plan. *See id.* § 5-5.10(a). The BOSL definition contains seven explicit exclusions. There are also eight statutory exemptions to the registration requirement. *Id.* § 5-10.

Matterport argues for both claims that individualized questions regarding exemptions and exceptions predominate over issues common the class. This order agrees.

The SAMP Act provides that a seller assisted marketing plan does not include: "A sale or lease to an existing or beginning business enterprise that also sells or leases equipment, products, supplies, or performs services that are not supplied by the seller and that the purchaser does not utilize with the equipment, products, supplies, or services of the seller, if the equipment, products, supplies, or services not supplied by the seller account for more than 25 percent of the purchaser's gross sales." Cal. Civ. Code § 1212.201(b)(6). Similarly, the BOSL exempts from registration: "Any offer or sale of a business opportunity where the purchaser has a net worth of not less than $250,000. Net worth shall be determined exclusive of principal residence, furnishings therein, and automobiles. The Secretary of State may by rule or regulation withdraw or further condition the availability of this exemption." 815 ILCS 602/5-10(d).

17

Certifying a BOSL claim would thus require an individualized review of each class member's net worth. A class action pursuant to a SAMP Act claim would similarly require an investigation into how each class member uses their camera in their business and the class member's gross sales should the class member not exclusively sell 3D camera scans. Plaintiff argues that other, more important questions for these claims are susceptible to classwide proof and that plaintiff bears the burden on the exceptions (Reply Br. 9). This order disagrees. The issue is whether classwide issues substantively predominate over individual issues. Here, they do not. Adjudicating these claims would require substantial information from each class member. Stemmelin has failed to demonstrate common questions of law and fact predominate as to his BOSL and SAMP Act claims.

### E.   SUPERIORITY.

In light of Stemmelin's failure to demonstrate predominance, this order does not address superiority.

### 5.   THE PARTIES' EVIDENTIARY OBJECTIONS.

This order did not rely on any of the material Stemmelin objected to, which he filed in contravention of Civil Local Rule 7-3. The objections are accordingly **DENIED AS MOOT**. Matterport also filed its objections to Stemmelin's filings in support of his reply brief in contravention of Civil Local Rule 7-3. In addition, this order did not rely on any of the material cited in Matterport's objections to plaintiff's reply briefing and supporting documentation. That objection is also accordingly **DENIED AS MOOT**.

## CONCLUSION

For the foregoing reasons, the class certification motion is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 14, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE